UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
JAVEL WELCH,

**DOCKET NO.:  CV-25-7081**

Plaintiffs

-against-

COUNTY OF NASSAU, NASSAU COUNTY SHERIFFS
DEPARTMENT, LIEUTENANT MARK CURATOLO,
in his official and individual capacity, IAU SUPERVISOR          **COMPLAINT**
ROBERT PIERCE, in his official and individual capacity,
CORRECTIONAL OFFICER PATRICK MANGANARO,
in his official and individual capacity, DA INVESTIGATOR
SEAN DONOVAN, in his official and individual capacity,
INVESTIGATOR JOSEPH ORLANDO, in his official
and individual capacity, CORRECTIONAL OFFICER
MICHAEL MCCANN, in his official and individual
capacity, INTERNAL AFFAIRS INVESTIGATOR
ANTHONY LIPP, in his official and individual
capacity, and Corrections Officers "JOHN DOES" 1 - 10
(whose names are currently in possession of DEFENDANTS
and not fully known to Plaintiff), in their official and
individual capacities,

Defendants.          ***JURY TRIAL DEMANDED***
-------------------------------------------------------------------X

PLAINTIFF JAVEL WELCH, by and through their attorneys, the LAW OFFICES OF
FREDERICK K. BREWINGTON, as and for his Complaint, states and alleges the following
claims against the above- named Defendants.

## PRELIMINARY STATEMENT

1.  This is a civil action seeking monetary relief, a declaratory judgement, compensatory and
punitive damages, disbursements, costs and fees, for violations of the Plaintiff's rights, brought
pursuant to 42 U.S.C. §1983, deprivation of freedom, lack of equal protection, selective and
discriminatory enforcement on the basis of race and/or color, negligent hiring and supervision,
negligence, recklessness, intentional and careless actions, and violation of the New York Executive

Law § 296 by the COUNTY OF NASSAU, NASSAU COUNTY SHERIFFS DEPARTMENT, LIEUTENANT MARK CURATOLO, IAU SUPERVISOR ROBERT PIERCE, CORRECTIONAL OFFICER PATRICK MANGANARO, DA INVESTIGATOR SEAN DONOVAN, INVESTIGATOR JOSEPH ORLANDO, CORRECTIONAL OFFICER MICHAEL MCCANN, INVESTIGATOR ANTHONY LIPP, and Corrections Officers "JOHN DOES" 1- 10 (whose names are currently in possession of DEFENDANTS and not fully known to Plaintiff), in their official and individual capacities.

2. Plaintiff alleges that the DEFENDANTS (collectively and individually) negligently, wantonly, recklessly, intentionally, and knowingly sought to and did wrongfully deprive Plaintiff of his Constitutional rights, pursuant to the above mentioned statutes and causes of action by committing acts under color of law and depriving the Plaintiff of rights secured by the United States Constitution and laws of the State of New York.

3. DEFENDANTS recklessly breached their duties of care with respect to their interactions with, and treatment of Plaintiff as described herein.

4. Plaintiff alleges that DEFENDANTS (collectively and individually) were callous, without regard, negligent in training, hiring, and supervising its Corrections Officers, decision makers, employees, representatives, and/or agents.

5. Plaintiff further alleges that DEFENDANT'S actions, including discriminatory treatment, were based on false accusations made by an untrustworthy inmate, who attempted to link Plaintiff to unlawful actions and another inmate.

## JURISDICTION AND VENUE

6. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

7. This Court is requested to exercise supplemental jurisdiction with respect to Plaintiff's State Law claims pursuant to 28 U.S.C. § 1367.

8. Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391, based on the fact that Plaintiff resides in Nassau County. Furthermore, the place where the events and violations

2

herein alleged occurred was in Nassau County.

## PARTIES

9. Plaintiff, JAVEL WELCH ( hereinafter "Plaintiff" or "Mr. Welch"), is an African American male, a citizen of the United States and resident of the County of Nassau, State of New York. Plaintiff JAVEL WELCH was violated and discriminated against by the NASSAU COUNTY SHERIFF'S DEPARTMENT in the course of his employment with the COUNTY OF NASSAU as DEFENDANT CURATOLO, IAU SUPERVISOR ROBERT PIERCE, CORRECTIONAL OFFICER PATRICK MANGANARO, DA INVESTIGATOR SEAN DONOVAN, OFFICER MICHAEL MCCANN, AND INVESTIGATOR JOSEPH ORLANDO targeted PLAINTIFF wrongfully, initiated and continued an investigation without probable cause, falsely arrested PLAINTIFF, abused process against PLAINTIFF, fabricated evidence against PLAINTIFF, discriminated against PLAINTIFF, searched PLAINTIFF'S person, belongings and car without probable cause or a warrant and have suspended PLAINTIFF from work and not allowed PLAINTIFF to resume his position at work and terminating him from his employment.

10. Defendant COUNTY OF NASSAU was and is a duly constituted municipal corporation of the State of New York existing and operating under and by the virtue of the laws of the State of New York.

11. Defendant NASSAU COUNTY SHERIFF'S DEPARTMENT is a law enforcement agency under the direction of Defendant COUNTY OF NASSAU.

12. Defendant LIEUTENANT MARK CURATOLO, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT, a law enforcement agency under the control of Defendant COUNTY OF NASSAU. Defendant Curatolo is a white male.

13. Defendant IAU SUPERVISOR ROBERT PIERCE, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT, a law enforcement agency under the control of Defendant COUNTY OF NASSAU.

Defendant Pierce is a white male.

14. Defendant CORRECTIONAL OFFICER PATRICK MANGANARO, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT, a law enforcement agency under the control of Defendant COUNTY OF NASSAU. Defendant Manganaro is a white male.

15. Defendant DA INVESTIGATOR SEAN DONOVAN, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY DISTRICT ATTORNEYS OFFICE, a law enforcement agency under the control of Defendant COUNTY OF NASSAU and/or the State of New York. Defendant Donovan is a white male.

16. Defendant CRIME INVESTIGATOR JOSEPH ORLANDO, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT, a law enforcement agency under the control of Defendant COUNTY OF NASSAU. Defendant Orlando is a white male.

17. Defendant CORRECTIONAL OFFICER MICHAEL MCCANN, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT, a law enforcement agency under the control of Defendant COUNTY OF NASSAU. Defendant McCann is a white male.

18. Defendant INTERNAL AFFAIRS INVESTIGATOR ANTHONY LIPP, sued in his official and individual capacity, was at all relevant times employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT, a law enforcement agency under the control of Defendant COUNTY OF NASSAU. Defendant Lipp is a white male.

## FACTUAL ALLEGATIONS

19. Mr. Javel Welch was employed by Defendant NASSAU COUNTY SHERIFFS DEPARTMENT as a correction officer since April 22, 2022, until his unlawful termination.

20. Becoming a correction officer was Mr. Welch's dream job, he took pride in his work, and he had a passion for the work he was doing. This was exemplified in the fact that Mr. Welch worked

all of the over-time he was offered, never complained when he had to work double shifts, even during his days off and was always respectful to his fellow and commanding officers. Mr. Welch worked hard to ensure he fulfilled his obligations as a member of the Sheriffs Department, he had a good relationship with officers and treated all inmates with respect.

21. At the time of all of the events herein Mr. Welch was on probation as an officer. He had approximately twenty four (24) days total, and sixteen (16) working days left in this probationary period.

22. On March 29, 2023, Mr. Welch arrived to work at the Nassau County Correctional Center in East Meadow around 3:20pm.

23. Mr. Welch attempted to sign in for overtime but was approached by Defendant Curatolo.

24. Defendant Curatolo directed Mr. Welch to follow him to an upstairs room.

25. Unbeknownst to PLAINTIFF, Defendant Curatolo was taking Plaintiff upstairs to the Internal Affairs unit in response to two complaints that were made against PLAINTIFF, about which Plaintiff had no prior knowledge.

26. The parties involved in the upstairs room, as part of the investigation against Mr. Welch include: LT. Curatolo, Inv. Cpl. Pierce, Inv. Cpl. Cusker, Investigator Hutter, Investigator Orlando, Investigator Lipp, Correction Officer Manganaro and K-9 dog Raya.

27. Plaintiff came to learn that the investigation of PLAINTIFF was due in part to a falsified inmate complaint made by inmate Vidale, who had a cooperation agreement with the District Attorney's office. The complaint and details were provided to Plaintiff after his arrest.

28. These complaints, written by DEFENDANT MCCANN and DEFENDANT MANGANARO, after Mr. Welch's arrest, allege that while conducting a search of the E01 E&F housing units, an inmate yelled that the "real person they should be searching was at the desk."

29. Although the inmate had referenced one person, there were multiple officers were by the desk, which made it difficult to ascertain who he was talking about. Yet the complaints specifically singled out Javel Welch as the person whom needed to be investigated.

30. Notably, at a later date, DEFENDANT MCCANN expressed to a third party, Monet Moore, President of the Nassau County Sheriffs Guardians, that he was in fact compelled to make this false statement against PLAINTIFF by DEFENDANT CURATOLO. He additionally expressed to Ms. Moore that he was forced to write this statement.

31. Upon arriving into the room with Internal Affairs a camera was activated by an officer in the corner, to record the interaction.

32. This recording caught the officers handling a burgundy bible. The bible Mr. Welch carried was green.

33. Defendant Curatolo then proceeded to ask Mr. Welch if he had any contraband on his person. Mr. Welch responded "no", unintentionally forgetting he had his cell phone on him after recently speaking with his sick son.

34. Mr. Welch placed the phone on the table and when asked if he was authorized to carry the phone, he responded "no" as Mr. Welch had no intention to disobey the phone policy of the jail.

35. Defendant Curatolo stated that possession of the phone constituted jail contraband and threatened Mr. Welch by stating that possession of his phone also constituted a D-Felony. Nevertheless, the area that Mr. Welch was in allowed cellphones and he had yet to be allowed to secure the phone otherwise.

36. It is a regular occurrence for officers to be in possession of their cell phones and white officers are never penalized for the practice of being in possession of their cell phones.

37. Mr. Welch never made it to the desk where officers turn in their phones if they forget to leave them in their cars because he was stopped by Defendant Curatolo.

38. Mr. Welch placed his book bag onto the table. Defendant Curatolo then asked Mr. Welch ambiguous questions about whether he recognized the officers and whether he had anything to disclose at that time.

39. Defendant Curatolo informed Mr. Welch that he could not advise him why he was in the room and that he could be randomly searched at any time.

6

40.  The officers proceeded to search Mr. Welch's book bag. Mr. Welch was asked to sit on the other side of the table while this occurred. All of Mr. Welch belonging were taken out of the bag.

41.  A K9 dog, Raya, was brought into the room to conduct a sniff of Mr. Welch belongings. The K9 dog was escorted out the room and the officers placed a small pocket size Bible on a chair. The K9 dog was brought back into the room and proceeded to sniff Mr. Welch, his belongings, and the small burgundy pocket size Bible.

42. To provide background, the pocket Bible was a gift to Mr. Welch from his mother who is a Minister and Mr. Welch carried the bible for his protection.

43.  Defendant Curatolo asked Mr. Welch what was on the Bible because the K9 dog had allegedly alerted officers to the Bible, that it "hit on it." Mr. Welch asked "What do you mean the dog hit on it?" Defendant Curatolo responded the K9 dog sat. Mr. Welch asked "So the dog sat?" There was no response given to this question. The officers walked out of the room with the Bible and out of Plaintiff's sight.

44. Notably, upon information and belief, Officer Manganaro told a fellow instructor in the academy that his dog **did not hit** on Mr. Welch's bible. The other officer told Mr. Manganaro he should report this, however Defendant Manganaro refused to do so and this fact was never brought to the attention of Internal Affairs or the District Attorney.

45. Additionally, the K9 dog, Raya, was removed from service approximately a month after this alleged occurrence with Mr. Welch.

46. Further, Mr. Welch's book bag was often left unsecured due to there not being assigned lockers for the officers' belongings when working in the jail. The book bag was unattended while Mr. Welch worked, leaving easy access for anyone to tamper with it. There was no contraband found inside the book bag.

7

47. Approximately one (1) hour later, DEFENDANTS alleged there may have been K2 residue on the Bible that Mr. Welch had in his back pack.[1]

48. Defendant Pierce's supporting deposition falsely identified the item as an "inmate Bible". This is inconsistent due to Mr. Welch owning a green pocket Bible. The Bible recovered was a burgundy pocket Bible. Additionally, inmate Bibles are full sized bibles and they must be obtained through a written request from a member of the clergy. The Bible Mr. Welch possessed was pocket sized.

49. Defendant Orlando's supporting deposition states the Bible was brought to the CIU drug room and inspected under the CIU magnifying glass. Several pieces of the Bible that were tested by the Tru Narc machine came back inconclusive. This fact was not considered by Defendants who made it clear that they intended to single Plaintiff out and cause him to lose his standing, his employment and his dream to be employed in law enforcement.

50. Notably, the Bible was tested by the Department, specifically by Investigator Orlando. It was then tested again twice by the lab. The Bible was tested three times before it eventually allegedly tested positive for anything at all. Specifically, it was alleged that after being handled by multiple persons, in multiple conditions, one page of the Bible tested positive for cocaine residue. By the time it had allegedly tested positive, it had been out of PLAINTIFF'S possession for six (6) months.

51. The papers in the Bible had bled into one another because as a trainee in the academy Mr. Welch would walk long distances, in formation, from the parking lot to the inside of the academy building and up to the classroom. This process is about a seven to ten minute walk. As a result, all of the books carried by Plaintiff, including the Bible, would get wet and pages would bleed into each other when it rained.

---

[1] "K2 and Spice are just two of the many trade names or brands for synthetic designer drugs that are intended to mimic THC, the main psychoactive ingredient of marijuana. These designer synthetic drugs are from the synthetic cannabinoid class of drugs that are often marketed and sold under the guise of "herbal incense" or 'potpourri.' intended to simulate marijuana. It is generally found in bulk powder form and then can be dissolved in solvents." https://www.dea.gov/factsheets/spice-k2-synthetic-marijuana

52. While Defendant Orlando speculated that the Bible looked like it contained narcotics, his speculation was false and unfounded as the machine read inconclusive results.

53. Mr. Welch was shocked and deeply hurt by the allegations that the Bible he carried would contain an illicit substance as he cherished the Bible as a symbol of love and protection as his mother had given him that Bible as a gift.

54. During the time Mr. Welch was being detained and not allowed to leave, he was not provided an explanation for his detention despite his repeated asking why he was there.

55. During this time of his detention, Mr. Welch was not given any indication that he was allowed to leave. To the contrary, he was being singled out, not free to leave, and was not offered any union representation or other contact with anyone with whom he could speak.

56. It was Defendants CAPTAIN DONAHUE and LT. CURATOLO who denied Mr. Welch's union representative, Mr. Hogan, access to the room for the purpose of representing Mr. Welch.

57. Around 5pm, Defendant Curatolo handed Mr. Welch what he represented was a search warrant for his vehicle. This representation was false and was instead, merely a tactic to be able to unlawfully search Mr. Welch's vehicle as Defendant Pierce's supporting deposition confirmed the document was actually a consent form. Mr. Welch, being in an environment that was intimidating and coercive in nature and having nothing to hide, signed the form under threat of being insubordinate and under the false belief it was a search warrant as was represented.

58. Mr. Welch then requested to be present during the search of his vehicle. Although an officer in the room agreed he should be able to advocate regarding the items in his car, Defendant Curatolo and Captain Donahue denied Plaintiff's request and dismissed the grant of representaion suggested by one of the officers and refused him the ability to be present.

59. Mr. Welch raised concerns that anything could be planted in his vehicle and he wouldn't be there to defend himself. These concerns were ignored and Plaintiff's request was disregarded.

60. Mr. Welch asked repeatedly "Why am I here?" and was informed that Defendant Curatolo would let him know. Attempting to make sense of what was occurring, Mr. Welch then stated, "When

police pull someone over don't they give them a reason." The officers in the room agreed and yet Mr. Welch was not provided information.

61.  About thirty (30) minutes later, Mr. Welch was notified by Defendant Curatolo that his weapon, stored in his vehicle was loaded and not safely secured in his vehicle. The weapon was retrieved by an officer who is now deceased, Craig Portee. In spite of that, Defendant Pierce's supporting deposition conceded that no contraband was found in Mr. Welch's vehicle.

62.  Notably, Mr. Welch's doors were locked, there are 24/7 security cameras in the parking lot, as well as cars that patrol the parking lot and the parking lot was secured away from the public.

63. Like many other officers, Mr. Welch had been advised, when he initially started, that it was permissible to store his weapon in his personal vehicle.

64. Further, on a separate occasion while Mr. Welch was working within the jail, he had attempted to bring his firearm to the desk and was told by the desk officer to " leave that sh*t in your f*cking car like everyone else. We don't want that sh*t," while laughing. It is still the practice for senior Officers to leave their firearm at the desk.

65. The officer, Craig Portee, who is now deceased, aided in the search of Mr. Welch's car and was the same rank as Mr. Welch. The search of Mr. Welch's car was not the general practice for officers of the same rank and this did not fall within the scope of his duties.

66. Officer Manganaro's statement states that Defendant Curatolo found the firearm but no statement from Defendant Curatolo corroborates this account.

67. Around 6:00 pm, Defendant Curatolo and Captain Donahue asked Mr. Welch to take off his uniform shirt and return his badge, as well as his official identification card because he was suspended until further notice, pending an investigation.

68. Following the falsely represented warrantless search of his person and vehicle, Mr. Welch was placed under arrest for the alleged jail contraband and possible K2 on the Bible. Mr. Welch was charged with one count of Promoting Prison Contraband in the First Degree ( a Class D felony); one count of Promoting Prison Contraband in the Second Degree (a Class A misdemeanor); and one count

of Failure Safely Store Rifles, Shotguns, and Firearms in the First Degree (a Class A misdemeanor). Plaintiff is aware of white officers who store their firearms in their car, but is unaware of any of those white officers who have faced such a charge.

69.    Upon information and belief, a white officer by the name of John McLoughlin, a correction officer for Nassau County, left his fire arm, which was loaded with at least one live round of ammunition, in an unlocked car while out on a night of socializing. The gun was then stolen from the car and led to the person who took the gun shooting himself, causing death. John McLoughlin is still employed by the Nassau County Sheriff's Department and was at some point promoted to the Gang Unit.

70.    Mr. Welch was embarrassed to be walked out of the jail out of uniform, in cuffs, in front of his law enforcement peers, superiors and detainees.

71.    Mr. Welch was subsequently taken to the DA's office and placed in a holding cell where he remained from 7:00pm to 11:00pm.

72.    While in the holding cell, Mr. Welch was required to remove his belt, remove the laces out of his boots, and take pictures after providing his fingerprints.

73.    Mr. Welch later was placed in a room with two investigators. One of the investigators finally read Mr. Welch his Miranda rights and Mr. Welch signed a piece of paper which to his knowledge only contained the questions that were asked of him in the interview.

74.    During the interview with SEAN DONOVAN and EDWARD MALLEY Mr. Welch was asked if he knew of anyone bringing things into the facility, to which he responded "no". The investigators reiterated the question.

75.    Mr. Welch in an effort to cooperate stated, " No I'm sure there are people but I don't know anyone and I'm not going to just say anyone's name just because but if you want to know something ... the inmates said drugs come in through the kitchen. Check the kitchen".

76.    During the interview, Mr. Welch's union representative, Brian Doyle, was present at the location, but SEAN DONOVAN and EDWARD MALLEY did not authorize the union representative

to come in the room, despite Plaintiff wanting to have representation present.

77.   After approximately, fifteen to twenty minutes of intrusive questioning and searching without his union representative, Mr. Welch was placed back in the holding cell.

78. Defendant Curatolo asked Mr. Welch if anyone was at his residence to retrieve his other firearm. Mr. Welch contacted his sister to advise her about the events that transpired. Mr. Welch instructed her on how to gain access to the firearm from the lock box and also requested her to pack him a change of clothes.

79.   Ultimately, after the passage of hours, Defendant Curatolo replied and told Mr. Welch, "IF the Bible comes back clean, then you're good." Despite the fact that the Bible apparently came "back clean", Mr. Welch was not released at that time.

80. As this was happening, Mr. Welch overheard one of the investigators on the phone discussing if there was room over at headquarters and stating that Mr. Welch was a "CO that had a Bible doused in K2". Knowing this to be a false statement, Mr. Welch was devastated by the allegation. Mr. Welch was then transported to headquarters shortly after.

81.   Mr. Welch told the Lieutenant at the desk in headquarters that he wanted to make a call. The Lieutenant replied that he will be able to do that for Mr. Welch.  This was yet another false statement.  Thereafter, Mr. Welch was placed in the cell and was never given the opportunity to make a phone call.

82. The following morning on March 30, 2023, news reporters and cameras were present outside of headquarters where Plaintiff could be displayed and humiliated in what is often called the "perp walk."

83. Mr. Welch was additionally moved into a cell with another individual who was handcuffed in the front.

84.   When Mr. Welch informed the officer that he is not to be placed in a cell with another individual because he is law enforcement, the officer did not take him seriously and responded to Plaintiff by stating "that it was okay because the guy is cuffed."  This caused Plaintiff great concern

as the man being cuffed in the front did not translate to Plaintiff being safe from attack and being harmed.

85. About 15 minutes later, the other individual was removed and the officer informed Mr. Welch that he was next.

86. Mr. Welch was removed out the cell and a officer yelled out "on the walkout", which alerted the camera crew that Mr. Welch was being subjected to a "perp walk" for news and public consumption.

87. As Mr. Welch walked out he noticed the news outlets were outside.

88. Following this, Mr. Welch was placed on the bus with other pre-trial detainees who also had court despite policy dictating that for his safety he was to be transported alone. Notably, Mr. Welch was cuffed to the back and everyone else on the bus was cuffed to the front. This left Mr. Welch in a dangerous position of not being able to protect himself should there be an accident or an attempted assault on his person.

89. When the bus arrived at Nassau County District Courthouse at 99 Main Street, Hempstead, NY, Mr. Welch was the first escorted off the bus and he was then placed in a room downstairs.

90. Brian Doyle, a union representative, entered the room and introduced himself to Mr. Welch. Mr. Doyle let Mr. Welch know that a union attorney, Frank, was representing him or he could hire his own attorney. Doyle also explained that he had come to represent Plaintiff at the District Attorney's Office, however he was not allowed to enter and have access to Plaintiff.

91. Mr. Doyle informed Mr. Welch that an arraignment would transpire soon and he would be released on his own recognizance. Mr. Doyle then left the room and returned ten (10) minutes later.

92. Upon Mr. Doyle's return, Mr. Doyle explained that Frank, the union attorney, had declined to represent Mr. Welch because he did not want to burn bridges with anyone involved in Mr. Welch's case who are affiliated with the Union.

93. Mr. Welch was transferred upstairs and another attorney named Cheryl Bartow represented him. Ms. Bartow apologized to Mr. Welch and expressed that Mr. Welch was just another targeted

Black man. Ms. Bartow also shared her experience on how a K9 dog sat after sniffing her at jail before and that to her knowledge K2 could not be tested by a K9.

94. Mr. Welch was arraigned on March 30, 2023 at Hempstead District Court and released on his own recognizance (ROR).

95. Further, when Mr. Welch was ROR'd there was a swarm of camera, questions and comments from the news which he was forced to encounter.

96. Mr. Welch was made to return to Court multiple times over the next year and two months, each time he maintained his total innocence.  Eventually,  Mr. Welch's criminal charges were dismissed as an adjournment in contemplation of dismissal on May 16, 2024 after going to Court for appearances.

97. Notably, he was told the reason his charges were not taken to the Grand Jury were because "there was no evidence."

98. Being on ACOD made Mr. Welch feel as though his wrongful proceeding was being dragged out.

99. Mr. Welch received termination letters at his current address in West Hempstead, NY on April 1, 2023. According to the letter, Mr. Welch's termination was effective as of March 29, 2023. Simultaneously, the termination letters were sent to an address at which Mr. Welch did not live, and had not lived since 2004 in Roosevelt, NY. This misdirection was done to create a narrative of association with an inmate, Hoosendove, with whom Mr. Welch attended high school and had known in his childhood for a brief period of time.

100. Moreover, in March of 2024, Mr. Welch was wrongfully named party to a civil suit alleging the death of an inmate, Ray Digiacomo, as a direct result of the allegations connected to his arrest.

101. On March 8, 2025, Mr. Welch sent a letter to Sheriff Anthony LaRocco requesting reinstatement and outlined the misconduct that occurred. Mr. Welch was not and has not been reinstated.

102. At the time of Mr. Welch's termination, he only had twenty four (24) days at most left of his probation period and sixteen (16) working days.

103. Notably, upon information and belief, there are reports of his badge sitting on LT. CURATOLO'S desk on display as a trophy.

104. Further, LT. CURATOLO, had told at least two third parties, one of the Nassau County Sheriff Guardians Vice President and an anonymous officer who reported to Nassau County Sheriffs Guardian President Monet Moore, that Mr. Welch was a gang member and said the Plaintiff had "BLOOD" written on his chest and had been arrested "about nine times". Further, CURATOLO, showed his bias and race based animus by questioning, how could Plaintiff come out of the academy with a brand new car and air fresheners, adding "How could the County hire someone like that?" These allegations were unequivocally and verifiably false, scurrilous and raised clear questions of discriminatory attitudes toward Plaintiff.

105. Mr. Welch termination was the result of racial profiling and discrimination. White officers have been accused of more severe misconduct and remained employed, displaying unequal treatment based on race. In fact, Lieutenant Curatolo himself, has been accused by inmates of more severe conduct and remains employed.

106. Former Sheriff Sposato, a white male, has been cited by a Federal Judge stating:

> In modern parlance, the idiom "There's a new sheriff in town"
> denotes the arrival of a leader who will enforce rules that have
> been neglected. Particularly when set against this illustrious history,
> the testimony of and actions by the individual defendant in this case –
> Michael Sposato, former Sheriff of Nassau County – prove disgraceful.
>     \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> Thus, across the spectrum of these considerations, Sposato's actions
> were highly reprehensible, particularly when emanating from one of the
> County's chief law enforcement officers. And, of course, his position as
> a prominent public official raises the concerns of deterrence, an important
> purpose of punitive damages.
> (Hon. Gary Brown in *Perros et al v. County of Nassau et al,* 15-cv-05598-GRB-ARL

(Docket Entry No. 155 at pages 2 and 27 respectively)

107. Despite the wrongful actions which were conceded by the County of Nassau, Sposato was not disciplined in any fashion, in fact he was rewarded and given a high paying position in the

County and then made Commissioner of Corrections after Sposato previously served as county sheriff but was fired in 2018 by the Curran administration following a string of inmate deaths. Then Nassau County Executive Blakeman appointed Sposato as Commissioner of Corrections in September 2022 — a position he held until December 2023 when Sposato moved to Nassau University Medical Center, serving as executive director of public safety and investigations, earning $275,000 annually.  Now, Sposato is back as corrections commissioner, with a salary of $170,000.  This treatment of the high ranking white former Sheriff shows a very different approach from the treatment afforded Plaintiff.

108.  In addition, in another lawsuit filed in, or about October of 2014, it was alleged that Sheriff Michael Sposato, who was supposed to turn off the recording equipment at the Nassau County Correctional Facility during a privileged call between lawyer and client, allowed officers at the facility to routinely tape the phone calls, which are then handed over to prosecutors without any subpoenas. Nothing was done to Mr. Sposato for his abuse and violative acts toward the civil and Constitutional rights of detainees.

109. Additionally, Mr. Welch tried to apply for other employment at Rikers Island and was unable to obtain employment with Rikers Island as a direct result of the institution of Mr. Welch's wrongful and false criminal allegations.

110. Mr. Welch attempted to apply for his Civilian Concealed Carry Permit. When he attempted to give the class certificate and apply,  he was told that the investigator would see his prior arrest and disqualify him or tell him to withdraw his name.

111. Mr. Welch was unable to find comparable employment in law enforcement or security for two years.

112. During this time, as Mr. Welch suffered immense loss, embarrassment, emotional and psychological stress, LT. CURATOLO was showing photos of Officer Welch to new recruits at the training academy stating that he had been arrested for bringing drugs into the jail.  A fact that Defendant Curatolo was not true and was intended to humiliate and demean Plaintiff.

113. The investigation, arrest, arraignment, subsequent court appearances, and termination of Mr. Welch has caused him great emotional pain, embarrassment, humiliation and financial loss and other damages yet to be fully calculated.

**AS AND FOR A FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 EQUAL PROTECTION AND MONELL LIABILITY**

114. The Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 113 of this Complaint with the same force and effect as though fully set forth herein.

115. The Defendants, COUNTY OF NASSAU, NASSAU COUNTY SHERIFFS DEPARTMENT, LIEUTENANT MARK CURATOLO, IAU SUPERVISOR ROBERT PIERCE, CORRECTIONAL OFFICER PATRICK MANGANARO, DA INVESTIGATOR SEAN DONOVAN, INVESTIGATOR JOSEPH ORLANDO, CORRECTIONAL OFFICER MICHAEL MCCANN, INVESTIGATOR ANTHONY LIPP, and Corrections Officers "JOHN DOES" 1 - 10, their agents, employees and servants, lacked reasonable suspicion to initially confine the PLAINTIFF Javel Welch and the Collective Defendants, their agents, employees and servants lacked probable cause to continue to hold him in prolonged custody.

116. The unlawful confinement, false detention, false arrest, malicious prosecution, abuse of process, search, and other wrongful acts taken against the Plaintiff by the Defendants, COUNTY OF NASSAU, NASSAU COUNTY SHERIFFS DEPARTMENT, LIEUTENANT MARK CURATOLO, IAU SUPERVISOR ROBERT PIERCE, CORRECTIONAL OFFICER PATRICK MANGANARO, DA INVESTIGATOR SEAN DONOVAN, INVESTIGATOR JOSEPH ORLANDO, CORRECTIONAL OFFICER MICHAEL MCCANN, INVESTIGATOR ANTHONY LIPP, and Corrections Officers "JOHN DOES" 1 - 10, its agents, employees, and servants, were carried out under color of law, customs, and statutes of the State of New York.

117. Acting under color of law, the Defendants, their agents, employees, and servants deprived the Plaintiff of his rights under the Fourth, Fifth, and Fourteenth Amendments by unlawfully arresting and detaining Mr. Welch without any lawful justification. In doing so, the Plaintiff's right to be free

from unreasonable searches and seizures, due process, as well as the Plaintiff's right to equal protection under the law.

118.  The arrest and detention of Plaintiff, Javel Welch, without probable cause, along with other wrongful acts committed by the Defendants, including, but not limited to the intentional and unlawful imprisonment, humiliation, and illegal search of Plaintiff's personal belongings constitutes a violation of his rights under the Fourth Amendment to the United States Constitution, which protects against unreasonable searches and seizures. Such actions were volatile, negligent, reckless, unreasonable, and unauthorized. DEFENDANTS had a duty to refrain from subjecting Plaintiff to false arrest, false imprisonment and other wrongful acts, yet failed to uphold that duty and there by breached their legal obligations in violation of 42 U.S.C. § 1983.

119. While acting under color of law, Defendants, their agents, employees, and representatives restricted Plaintiff's liberty. Treated him differently and more harshly than white officers accused of wrong doing. Plaintiff was wrongfully detained for an indefinite period without any permission, any legitimate justification and/ or due process guarantees required by the Fifth and Fourtheenth Amendments of the United States Constitution, there by violating his constitutional rights to due process and freedom from unlawful detention.

120. Additionally, Defendants, specifically targeted Plaintiff in the course of his employment by setting up an investigation, falsely accusing Plaintiff of bringing contraband into the jail without evidence, and enacting a warrantless search of the Plaintiff's car. When no evidence was found to support these contentions Plaintiff remained suspended from work and had not returned to work.

121. Other officers including but not limited to Officers Curatolo and Manganaro, and Sheriff Sposato have had unfounded and founded allegations lodged against them, of a more severe nature than the ones lodged against Mr. Welch, and they have remained employed with the NASSAU

122.    All relevant actions taken by Defendants and those with delegated authority to act on their behalf were taken under color of law.

123.    Defendants have engaged in an intentional and systematic policy, pattern, and/or

18

practice of discrimination against Plaintiff in violation of the Equal Protection Clause through the selective and discriminatory actions stated herein.

124.    The injury sustained by Plaintiff resulted from the actions of the inividual Defendants and a municipal policy or custom, that fostered and allowed unequal treatment of Black officers and different and more leniant treatment of white officers.

125.    These policies are intended to, and do have the effect of, denying Plaintiff and the Class equal opportunities to become police officers in Nassau County, as set forth in detail above.

126.    Similarly, Defendants' selection criteria, improper training and supervision of individuals involved in the review, investigation and decision making process, and willful indifference to the disparities in results on the basis of race and/or color demonstrated by the facts of this case and the treatment of Plaintiff and other white officers faced with allegations of wrong doing constitutes a deliberate policy and practice of intentional discrimination.

127.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiff suffered damages including, but not limited to, lost employment, lost employment opportunities and lost past and future income, compensation, and benefits, emotional injury, humiliation and embarrassment and injury to his professional status.

128.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the Equal Protection Clause.

129. As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation/embarrassment,  and degradation. Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the DEFENDANTS until their release and beyond.

130. In doing so, DEFENDANTS caused serious and unjustifiable harm to PLAINTIFF.

131.  That by reason of the foregoing, PLAINTIFF has  been damaged in a sum in excess

19

of five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees

## AS AND FOR A SECOND
## 42 U.S.C. § 1983 FALSE ARREST

132.  The Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 131 of this Complaint with the same force and effect as though fully set forth herein.

133.  DEFENDANTS, without probable cause, intentionally subjected PLAINTIFF to detainment and arrest to which he did not consent in violation of his Fourth Amendment Rights.

134. The accusations of wrongful conduct against PLAINTIFF were false, improper and were an attempt to disguise and cover up the race based actions and differential treatment of DEFENDANTS.

135. Specifically, PLAINTIFF was unlawfully searched wherein corrections officers found Plaintiff's phone on his person. At the time,  PLAINTIFF was in an area where cell phones were permitted and not given the opportunity to return the phone to the desk.

136. Further, PLAINTIFF was then confined and then forced to submit to allow a search of his vehicle using improper methods of coercion.

137. Upon information and belief such continued seizure of the PLAINTIFF included being taken to an Internal Affairs Bureau room, recorded, searched and interrogated regarding whether or not PLAINTIFF had any contraband on him.

138. The search of PLAINTIFF resulted in PLAINTIFF being wrongfully arrested and taken to the District Attorney's Office although there was no evidence that PLAINTIFF had engaged in any criminal activity.

139. PLAINTIFF was forced to participate in the criminal process although he had never committed any criminal activity and persistently denied all allegations of wrong doing.

140. In doing so, DEFENDANTS caused serious and unjustifiable harm to PLAINTIFF.

141. That by reason of the foregoing, PLAINTIFF has been damaged in a sum in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

**AS AND FOR A THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 MALICIOUS PROSECUTION**

142. The Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 141 of this Complaint with the same force and effect as though fully set forth herein.

143. COLLECTIVE DEFENDANTS did insure that a proceeding was initiated against the Plaintiff as they falsely accused the Plaintiff, provided inconclusive results to the District Attorney and aided in ensuring Plaintiff would be falsely prosecuted for crimes in which he did not commit and DEFENDANTS knew Plaintiff had not committed based on the facts and evidence before them.

144. Specifically, the search of PLAINTIFF resulted in PLAINTIFF being arrested and taken to the District Attorney's Office although there was no evidence that PLAINTIFF had engaged in any criminal activity and PLAINTIFF had adamantly denied his involvement in any criminal activity.

145. PLAINTIFF was forced to participate in the criminal process although he had never committed any criminal activity and persistently denied all allegations of wrong doing.

146. As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to

great fear, terror, personal humiliation, and degradation. Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the DEFENDANTS until their release and beyond.

147. In doing so, DEFENDANTS caused serious and unjustifiable harm to PLAINTIFF.

148. That by reason of the foregoing, PLAINTIFF has been damaged in a sum in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
## 42 U.S.C. § 1983 ABUSE OF PROCESS

149. PLAINTIFF repeats, reiterates and realleges the allegations set forth in paragraphs 1 through 148 with the same force and effect as though fully set forth herein.

150. DEFENDANTS, in their individual and official capacities, did use the criminal process as a mode of ensuring the Plaintiff would be denied the job in which he was presently employed.

151. Specifically, DEFENDANTS, fabricated reports against the Plaintiff, alerted the District Attorney of crimes that Plaintiff did not commit and provided inconclusive evidence to be used in the prosecution against the Plaintiff.

152. Further, DEFENDANTS, ensured that Plaintiff did not return to work even after his participation in the criminal process and the dismissal of all charges.

153. As a result of said abuse of process, Plaintiff suffered mental, emotional, and psychological harm. Additionally, Plaintiff was terminated which resulted in ongoing economic loss.

154. That by reason of the foregoing, PLAINTIFF has been damaged in a sum in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
### FABRICATION OF EVIDENCE

155. PLAINTIFF repeats, reiterates and realleges the allegations set forth in paragraphs 1 through 154 with the same force and effect as though fully set forth herein.

156. DEFENDANTS, in their individual and official capacities, lacked reasonable suspicion to initially stop the PLAINTIFF on his way into work when he had arrived for his shift that day.

157. DEFENDANTS, specifically, Defendant Curatolo, his agents and employees, intentionally created a false narrative wherein PLAINTIFF was engaging in illegal activity with a person from his past who happened to be housed at the jail.

158. Specifically, DEFENDANT CURATOLO instructed DEFENDANT MCCANN to create a false report indicating PLAINTIFF in an alleged drug related scheme with the inmate whom he had lived near in the past.

159. Even after DEFENDANTS had become aware that there was no evidence PLAINTIFF had engaged in illegal activity, PLAINTIFF was still seized, arrested and forced to go through the criminal process.

160. Further, DEFENDANTS were aware that the actions taken against the PLAINTIFF were false, unnecessary and without probable cause, however, the DEFENDANTS continued to harass, intimidate, and prosecute the Plaintiff.

161. Additionally, Defendants, acted individually and collectively to fabricate the statement of DEFENDANT MCCANN in an effort to see to PLAINTIFF'S arrest and termination.

162. As a result of said fabrication of evidence, Plaintiff suffered mental, emotional, and psychological harm as well as embarrassment and humiliation. Additionally, Plaintiff was terminated which resulted in ongoing economic loss.

163. That by reason of the foregoing, PLAINTIFF has been damaged in a sum in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NEW YORK STATE EXECUTIVE LAW § 296

164. PLAINTIFF repeats, reiterates and realleges the allegations set forth in paragraphs 1 through 163 with the same force and effect as though fully set forth herein.

165. NASSAU COUNTY SHERIFFS DEPARTMENT did discriminate against the PLAINTIFF on the basis of race when they launched an investigation against the PLAINTIFF that resulted in both criminal prosecution and removal from his position without probable cause or conclusive evidence of wrong doing.

166. PLAINTIFF, was presently working as a NASSAU COUNTY CORRECTIONS OFFICER, when he was stopped while on his way into work and accused of attempting to bring his phone into the jail even though PLAINTIFF had not passed the desk where officers turned their phones in.

167. Notably, Mr. Welch's cell phone was also seized and never returned.

168. PLAINTIFF, was then detained, questioned, had his bible and car searched and his bible seized. When the results of the testing of the bible came back inconclusive PLAINTIFF was still placed on leave and has not been allowed to return to work.

169. As a result of said discrimination of PLAINTIFF in the course of his employment in violation of New York Executive Law §296, Plaintiff suffered mental, emotional, and psychological harm. Additionally, Plaintiff was terminated which resulted in ongoing economic loss.

170. That by reason of the foregoing, PLAINTIFF has been damaged in a sum in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.


## DAMAGES AND RELIEF

**WHEREFORE**, the Plaintiff each request the following damages and relief:

a.      On the First Count in excess of the sum of five million  ($5,000,000 ) dollars;

b.      On the Second Count in excess of the sum of five million  ($5,000,000 ) dollars;

c.      On the Third Count in excess of the sum of five million  ($5,000,000 ) dollars;

d.      On the Fourth Count in excess of the sum of five million  ($5,000,000 ) dollars;

e.      On the Fifth Count in excess of the sum of five million  ($5,000,000 ) dollars;

f.      On the Sixth Count in excess of the sum of five million  ($5,000,000 ) dollars;

g.      Compensatory and Punitive damages in excessive of ten million dollars ( $10,000,000), and damages, as outlined  in the  aforementioned paragraphs and counts, as well as costs and attorneys fees pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law; and,

h.      Injunctive relief, requiring DEFENDANTS to correct all past violations of federal and state law as alleged herein; to enjoin DEFENDANTS from continuing to violate federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

i.      A declaratory judgment stating that DEFENDANTS wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

j.      Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and other fee and costs statutes;

k.      Any and all other relief this Court deems appropriate and just.

***JURY TRIAL DEMANDED***

Dated:  Hempstead, New York
      December 24, 2025            Respectfully submitted,

                                     LAW OFFICES OF
                                     FREDERICK K. BREWINGTON

By:    *Frederick K. Brewington*
                                     FREDERICK K. BREWINGTON
                                     *Attorneys for Plaintiff*
                                     556 Peninsula Boulevard
                                     Hempstead, NY  11550
                                     (516) 489-6959

26